UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHOYA ANTHONY TINSLEY,

        Petitioner,

                                   Case No. 12-12875

v.

                                   HONORABLE MARK A. GOLDSMITH

DAVID BERGH,

        Respondent.

_____/

### OPINION & ORDER
### (1) DENYING THE AMENDED PETITION (Dkt. 18), (2) DENYING A CERTIFICATE OF APPEALABILITY, AND (3) GRANTING LEAVE TO APPEAL IN FORMA PAUPERIS

Michigan prisoner Choya Anthony Tinsley ("Petitioner") filed a pro se petition for the writ of habeas corpus under 28 U.S.C. § 2254, challenging his convictions for first-degree murder, assault with intent to commit murder, and possession of a firearm during the commission of a felony. The convictions followed a jury trial in the Circuit Court for Wayne County, Michigan. Petitioner was sentenced to a life sentence for the murder conviction, a concurrent term of 171 months to twenty years in prison for the assault conviction, and a consecutive term of two years in prison for the felony-firearm conviction. In his petition (Dkt. 18), Petitioner alleges: (i) the prosecution suppressed material evidence; (ii) trial counsel's failure to investigate and produce crucial witnesses violated his Sixth Amendment right to effective assistance of counsel; (iii) the prosecutor's misconduct deprived him of a fair trial and due process; (iv) the prosecutor's failure to disclose an eyewitness's reward for testifying deprived him of a fair trial and due process; and (v) trial counsel's failure to object to the prosecutor's misconduct violated his Sixth Amendment right to effective assistance of counsel. Brief in Support of Amended Pet. at ii (Dkt. 18). For the reasons stated below, the Court denies the amended petition, denies a certificate of appealability, and grants leave to appeal in forma pauperis.

# I. BACKGROUND

The Court recites verbatim the relevant facts relied on by the Michigan Court of Appeals:

> Defendant's convictions arose from the October 20, 2006, shooting death of Charles Mosley and the nonfatal shooting of Mosley's girlfriend, Darlene Russell. Both victims were shot while sitting inside an automobile at a gas station in Detroit. Russell identified defendant as the shooter. According to Russell, defendant and an accomplice previously confronted both of them at Mosley's home on October 1, 2006, and threatened them with guns. Defendant was separately charged with felonious assault and felony-firearm in connection with the October 1 incident.

> This case was originally consolidated with the felonious assault case. At a previous trial in July and August 2007, the jury found defendant guilty of felonious assault and felony-firearm in connection with the October 1 incident, but was unable to reach a verdict with respect to the charges in this case, relating to the October 20 incident. Defendant was retried on those charges in May 2008. Defendant presented an alibi defense and argued that witness descriptions of the shooting were inconsistent with his appearance on the date of the offense.

See People v. Tinsley, No. 287470, 2010 WL 4671122, at *1 (Mich. Ct. App. Nov. 18, 2010).

At trial, Ms. Russell testified in detail about the events of October 1 and October 20, 2006. Regarding the incident at Mosley's house on October 1, 2006, Russell stated that she did not know Petitioner at the time, but that Mosley had said Petitioner was Chakan Tinsley's brother. She subsequently heard Petitioner question Mosley about Petitioner's sister. As the conversation between Petitioner and Mosley became louder, Petitioner pulled out a gun and backed Mosley into the hallway. Petitioner's accomplice also had a gun, and she told both men to get out of the house. After the men left the residence, she reported the incident to the police. Later, at Petitioner's preliminary examination, she informed Sergeant Diaz that she thought a man in the courthouse was the same man who was with Petitioner at Mosley's house on October 1. She subsequently learned that the man's name was Chivas Dooley.

Regarding the incident on October 20, 2006, Russell testified that she and Mosley were sitting in Mosley's car at a gas station when she heard a gunshot, which broke the glass in the window behind the driver's door. She turned and saw a man shooting a gun as he ran toward Mosley's car. A bullet hit Mosley and incapacitated him. The shooter then approached the car and fired more gunshots. He shot her in the abdomen before running away. Nobody else was near the car at the time. Ms. Russell stated that the shooter had a beard, was not very tall, was stocky, and was wearing a tan, three-quarter length jacket. 5/12/08 Trial Tr. at 139-192 (Dkt. 11-39).

Russell explained that, after the shooting at approximately 1:40 p.m., she called the 911 operator and reported that she and Mosley had been shot. She did not tell the operator that Petitioner had shot her because she was not asked who shot her, and the point of her call was to describe her location and to get help. Later that day, at the hospital, she informed Officer Malone that it was Petitioner who had shot her and Mosley. She asked Officer Malone to call Sergeant Eby because Eby was the officer who had taken her report about the assault at Mosley's house on October 1. On the following day, she identified Petitioner in a photographic array. At trial, she had no doubt that Petitioner was the man who shot her. 5/13/08 Trial Tr. at 15-116 (Dkt. 11-40).

Detroit Police Officer Emily Kincaid testified that, on October 1, 2006, she was dispatched to a home on Strathmore Street in Detroit for a felonious assault. When she arrived at the house, Mosley informed her that two men whom he permitted to enter his house had subsequently pulled out guns and pointed their guns at him. Mosley identified one of the men as his ex-girlfriend's brother, Choya Tinsley, and he said that Petitioner had told him to stop disrespecting his sister. Mosley thought that Petitioner was angry with him because Mosley had provided Petitioner's sister with a leased vehicle and taken the vehicle back after he broke up with her.

Officer Kincaid also responded to the shooting at the gas station near Strathmore and Fenkell Streets on October 20, 2006. The victim was no longer there, but she determined that the victim's car belonged to Mosley. She then realized that Mosley was the person she had spoken

with two weeks earlier on the felonious assault case. She informed the officers at the scene what she knew about the felonious assault case, and later that day, she relayed the same information to Sergeant Eby, who was in charge of the felonious assault case. Id. at 117-149.

Detroit Police Officer Donald Rem was the evidence technician assigned to the case. He responded to the shooting scene on Fenkell Street at 2:35 p.m. on October 20, 2006. He collected eight spent casings from outside the victim's vehicle and one fired bullet from inside the vehicle. The rear driver's side window of the car had been shattered, and he concluded from the casings that the shooter had used a semi-automatic weapon. No weapon was recovered at the scene. Id. at 149-194.

Emergency Medical Technician Rae C. Johnson was dispatched to the shooting scene at 1:41 p.m. on October 20, 2006. Mosley was seated in the driver's seat of the car and had no vital signs. Ms. Russell was seated in the passenger seat and had gunshot wounds, but she got out of the car and told Johnson that the shooter had been at her house previously. Russell did not mention the shooter's name, nor describe the shooter to Johnson. Id. at 194-231.

Eric Pringle testified that he heard gunshots while he was driving near the gas station in question. He made a U-turn and then parked across the street where he watched a hunched-over person creeping or tip-toeing toward a gray Cadillac near the gas pumps. The person was a stocky male with a thin goatee; he was five feet, ten inches tall or less; and he was wearing a white tee shirt, blue jeans, a Woodland army-print fatigue jacket, beige Timberland boots, work gloves, and a skull cap. No one else was near the victim's car at the time, and after a series of gunshots, the man ran away and got into a green Lincoln Continental. On cross-examination, Pringle admitted that he must not have told the police in his written statement on October 21, 2006, that the gunman had a goatee. 5/14/08 Trial Tr. at 4-52 (Dkt. 11-41).

Police Officer Michael Malone responded to the gas station and spoke with some officers who were already there. He then went to Sinai-Grace Hospital where Mosley was pronounced

dead.  Ms. Russell was also at the hospital.  She told him that Petitioner had shot her, and she suggested that Malone contact Sergeant Eby who was investigating Petitioner for another matter involving Russell and Mosley.  He recognized Petitioner's name and then realized that Petitioner was the man who was wanted in the felonious assault case.  Id. at 52-75.

Chelsea Mosley testified that Charles Mosley was her father and that Chakan Tinsley was her father's ex-girlfriend.  She stated that Mosley's relationship with Chakan ended in June of 2006.  Chelsea did not get along with Chakan, in part, because she thought that Chakan was using her father for his leased Cadillac.  On October 1, 2006, her father called her and said that Chakan's brother and a friend had come over to Mosley's house, pointed guns at him, and threatened to kill him.  Ms. Russell told her the same thing.  Id. at 76-119.

Sergeant Todd Eby was in charge of the felonious-assault case that resulted from the incident at Mosley's home on October 1, 2006.  He became involved in the case after reading a police report compiled by the officers who had responded to Mosley's home after the felonious assault.  On October 4, 2006, he spoke with Mosley who feared for his life after the incident that occurred at his home.  As a result of his conversations with Mosley and Ms. Russell, he prepared an arrest warrant for the county prosecutor's office to review.  Petitioner was the suspect named on the warrant, and on October 6, the warrant was issued for his arrest in connection with the incident at Mosley's home.  He directed Officer Malone to arrest Petitioner, but while Petitioner was at large, Mosley repeatedly called him to learn whether Petitioner had been apprehended.  He later learned about the shootings at the gas station, and after Petitioner's first trial, he sought a warrant for Chivas Dooley in connection with the incident that had occurred at Mosley's home on October 1.  Id., pp. 121-39.

Police Officer Joseph Stephens testified that Chivas Dooley was a friend of his and that he met Petitioner during a traffic stop in September of 2006.  Later, that same day, he met Petitioner at the home of Dooley's mother.  He recognized Petitioner from the traffic stop earlier in the day.

In October of 2006, he learned that there was a warrant for Petitioner's arrest on a charge of felonious assault. He then contacted Dooley and asked Dooley to get in touch with Petitioner and have Petitioner report to the police. On October 20, 2006, Stephens responded to the gas station where the shootings occurred. He acquired some information and then contacted Dooley and asked Dooley to bring Petitioner to the precinct. Dooley showed up at the precinct, but Petitioner was not with him. Id. at 139-180.

Jesse Ace testified that he lived near Fenkell and Strathmore Streets where the shooting occurred and that Mosley had lived down the street from him on Strathmore. On October 20, 2006, Ace was at home when he heard seven or eight gunshots coming from the area near the gas station. A minute or two later, he saw a young stocky black male with an automatic gun in his hand run past his house. The man was about five feet, six inches tall and nineteen to twenty years old. He was wearing a brown jacket, and he ran toward an older green Lincoln, which was moving slowly down the street. The car stopped, and after the gunman got into the Lincoln, it sped off. At trial, Ace stated that he did not see the gunman's face and that he was not sure whether he could identify the person. 5/15/08 Trial Tr. at 6-29 (Dkt. 11-42).

David Vroman testified as an expert in firearms identification and toolmarking. In his opinion, the three fired slugs and eight casings in evidence came from the same source, and they were consistent with being fired from a semi-automatic gun, as opposed to a revolver. Id. at 33-89.

Dr. Francisco Diaz performed the autopsy on Mosley and testified that Mosley died from multiple gunshots. He classified the manner of death as a homicide. Id. at 89-96.

Daniel Baxter was working as a paramedic with Rae Ashford Johnson on October 20, 2006. The two of them responded to the shooting scene at 1:41 p.m. that day. The man in the driver's seat of the Cadillac at the gas station was deceased. The female passenger was wounded, but alive and frantic. Id. at 123-146.

Pauletta Taylor's testimony from a prior court proceeding was read into the record because she was unavailable at Petitioner's trial. She testified that, in October of 2006, she owned a candy store across from the gas station at Fenkell and Strathmore Streets. About 1:30 or 1:40 p.m. on October 20, 2006, she heard five or six gunshots and saw someone shooting into the back window of a Cadillac. She knew Mosley and eventually recognized the Cadillac as Mosley's vehicle. The shooter was the only person near the Cadillac, and he ran up Strathmore Street where he got in the passenger side of a dark green car. She then ran back into her store and called the 911 operator. She later told the police that the gunman was a black male between five feet, seven inches and five feet, eight inches tall and "kinda thick." He was wearing a tan army fatigue jacket with a hood. She did not see the gunman's face, and she did not see the driver of the green car. 5/19/08 Trial Tr. at 9-48.

Sergeant Gary Diaz testified that, at Petitioner's preliminary examination, he saw Chivas Dooley speaking with Officer Laneisha Jones in the hallway outside the courtroom. Later, he observed Dooley in the courtroom when Ms. Russell was testifying. He did not know Dooley at the time, but Ms. Russell informed him that she thought Dooley was one of the men who had assaulted Mosley at Mosley's house. Russell also pointed out Dooley in the hallway at Petitioner's first trial, but when he approached Dooley, Dooley declined to give his name. He later attempted to interview Dooley in a conference room in the courthouse. He did not threaten Dooley, but he did tell Dooley that Dooley would not be able to testify in court if he didn't speak with him. Dooley, nevertheless, declined to give a statement and said that Diaz could wait until they went to court to hear what he had to say.

On the issue of Ms. Russell's 911 call, Diaz testified that he attempted to acquire a recording of the call before the preliminary examination, but he received no response to his request. He submitted another written request after the preliminary examination and was told to check the dates and times because the communications office had no record of calls for the date and time

that he had written on the form. He then realized that he had written the wrong date on the second request. He subsequently made a third request and was advised by the supervisor of communications that the police purge 911 recordings after ninety days. By the time he made his third request, the ninety days had expired, and the tapes had been eliminated. Id. at 56-144.

Petitioner presented four witnesses in his defense. The first defense witness, Mario Jackson, testified that he and some of his co-workers stopped at the gas station near Fenkell and Strathmore Streets about 1:00 p.m. on October 20, 2006. He waited in their van while the driver of the van went inside the gas station. As he waited, he saw a young man in a camouflage jacket approach a Cadillac and fire gunshots through the driver's back window. The gunman was thin, in his early twenties, five feet, eight inches tall, and clean-shaven. Jackson stated that, although he saw the man's face on October 20, 2006, and would be able to identify him if he saw him again, he did not see the gunman in the courtroom. He became involved in the case because his friend "Bo" was Petitioner's brother, and Bo told him that his brother was a suspect in a homicide case. 5/20/08 Trial Tr. at 5-36 (Dkt. 11-44).

The second defense witness was Victor Burnett who stated that he was Petitioner's barber. He claimed that Petitioner and someone that he knew as Alonzo, Zo, or Chivas came into his barber shop about 11:00 a.m. on October 20, 2006. Petitioner had a full beard at the time. He trimmed Petitioner's beard and cut his hair after Chivas left the shop to take care of some business. When Chivas returned, he gave Chivas a haircut. Petitioner left the shop about 1:00 p.m. and returned about twenty minutes later. Both Petitioner and Chivas then left the shop. He learned about the shooting from Chivas a few days later. Petitioner's name was mentioned during that conversation. He and Chivas then recapped what had happened on the day of the shooting. Chivas also told him about the situation at the house on Strathmore where he had "got[ten] into it . . . with the guy." Burnett admitted that he had refused to make a statement at the prosecutor's office. He explained

that he had felt threatened by the prosecutor and Diaz at the time because Diaz stood in front of the door and told him that he could not testify if he did not make a statement. Id. at 37-86.

Chivas Dooley testified that he and Petitioner were good friends. He claimed to have heard about the shooting from Officer Joe Stevens, who told him that people were saying Petitioner shot somebody. Another friend, Officer Mike Crosby, also called him and asked him about Petitioner's whereabouts. He told both officers that Petitioner was with him, and he relayed the officers' information to Petitioner.

Continuing, Dooley testified that, about 9:00 a.m. on October 20, 2006, he picked up Petitioner at Petitioner's home. They went to Dooley's mother's home and then he took care of some personal business in Centerline while Petitioner went to the store next door. From there, they went to a Coney Island restaurant on Eight Mile Road and Wyoming. They left there about 10:58 a.m. and went to Victor Burnett's barber shop to get haircuts. Petitioner had a full beard before and after the haircut. Dooley left the shop while Petitioner was in the barber chair. He returned to the barber shop about 11:40 a.m., and after Burnett finished with Petitioner, Dooley had his hair cut. Meanwhile, Petitioner left the shop in Dooley's black Mercedes. Petitioner was gone about fifteen minutes, and they stayed in the barber shop another ten or fifteen minutes after Petitioner returned to the shop. The two of them left the shop about 12:25 or 12:30 p.m. From there, they went to the storage yard, the Coney Island, a gas station on Seven Mile and Rutherford, another gas station at Six Mile and Southfield, and then to Petitioner's home. By then it was after 1:00 p.m. They left Petitioner's house to pick up their children from various schools. He finally dropped Petitioner off at home about 4:00 p.m.

Dooley admitted that he was present at Petitioner's preliminary examination and that he spoke with Officer Laneisha Jones in the hallway before the examination. He also admitted that he had refused to provide a statement when the prosecutor and Diaz attempted to interview him in the prosecutor's office. He stated that the prosecutor and Diaz had been hostile toward him and

had told him that he could not testify if he did not make a statement. He claimed, however, that he told Officers Stevens, Crosby, and Dale Collins where he and Petitioner had been on the day of the shooting. He also claimed that Petitioner had been wearing work clothes and a blue jacket on the day of the shooting. Id. at 88-137; see also 5/21/08 Trial Tr. at 5-129 (Dkt. 11-45).

The fourth and final witness was Petitioner's fiancée, Rekita Reno. Ms. Reno testified that she and Petitioner were living together in October of 2006 and that Petitioner was home when she left for work at 7:45 a.m. on the day of the shooting. She did not see him again until 5:00 p.m. when she came home from work, but he was working with Chivas Dooley, and she did text him by cell phone before noon that day. Although she did not get a response to her text, she had informed Petitioner that her cousin's car would not start and that her cousin needed a boost. Petitioner had a beard at the time, and he was wearing a blue jacket that day. He spent that night at home with her, but he disappeared within days of the murder, which she learned about from the police. She next saw Petitioner on November 2, 2006, when he surrendered to the police with the help of his lawyer. 5/21/08 Trial Tr. at 150-69 (Dkt. 11-45).

The prosecution's rebuttal witness was police officer Dale Collins, who testified that he went to the crime scene and then went back to the precinct where he observed Chivas Dooley talking with some other officers. He did not know Dooley at the time, but he had the impression that Dooley was trying to find out what the police knew about the shooting. Dooley never indicated that he wanted to speak with Collins, and he never said that he had information about the homicide. Id. at 131-49.

On May 22, 2008, the jury found Petitioner guilty, as charged, of first-degree, premeditated murder, Mich. Comp. Laws § 750.316(1)(a), assault with intent to commit murder, Mich. Comp. Laws § 750.83, and felony firearm, Mich. Comp. Laws § 750.227b. 5/22/08 Trial Tr. at. 82-83 (Dkt. 11-46). On June 12, 2008, the trial court sentenced Petitioner to life imprisonment for the murder conviction, a concurrent term of 171 months (fourteen years, three months) to twenty years

in prison for the assault conviction, and a consecutive term of two years in prison for the felony-firearm conviction. Sentencing Tr. at 8 (Dkt. 11-47).

Petitioner, through counsel, filed a claim of appeal with the Michigan Court of Appeals, alleging that his trial attorney was ineffective for failing to call crucial witnesses at trial and failing to request a missing-evidence instruction. He also alleged that the trial court erred in failing to dismiss the charges after the destruction of a 911 tape and failing to instruct the jury on the missing evidence. Petitioner also filed a pro se supplemental brief, raising the following claims about the prosecutor's conduct: the prosecution presented false and misleading evidence, made disparaging comments about defense counsel, improperly argued extraneous matters to the jury, failed to endorse a key witness, and suppressed photographic evidence. Petitioner also argued that defense counsel was ineffective for failing to object to the prosecutor's conduct and establish that there was no warrant for Dooley's arrest. The Michigan Court of Appeals rejected these claims and affirmed Petitioner's conviction in an unpublished, per curiam opinion. See Tinsley, 2010 WL 4671122 (Mich. Ct. App. 2010). Petitioner then filed an application for leave to appeal in the Michigan Supreme Court, raising the same claims. On June 28, 2011, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues. See People v. Tinsley, 799 N.W.2d 6 (Mich. 2011) (table).

On June 29, 2012, Petitioner commenced this action, filing a pro se petition for writ of habeas corpus. Pet. for Writ of Habeas Corpus (Dkt. 1). Respondent, through counsel, filed an answer to the petition, alleging that Petitioner's claims were either procedurally defaulted or meritless. Answer in Opposition to Pet. for Writ of Habeas Corpus (Dkt. 12). Petitioner then moved for a stay so that he could return to state court and exhaust state remedies for his claim that he had newly-discovered evidence about the prosecutor's withholding of material evidence. Mot. for Stay and Abeyance (Dkt. 13). On July 17, 2013, the Court granted Petitioner's motion for a

stay and abeyance of the habeas proceedings and closed this case for administrative purposes. Opinion and Order (Dkt. 16.)

Petitioner, through counsel, then filed a motion for relief from judgment in the state trial court, arguing that he was entitled to a new trial because the prosecution violated his right to a fair trial by intentionally suppressing material 911 recordings. The trial court denied Petitioner's motion, and the Michigan Court of Appeals denied leave to appeal because Petitioner had failed to meet the burden of establishing entitlement to relief under Michigan Court Rule 6.508(D). See People v. Tinsley, No. 323659 (Mich. Ct. App. Oct. 24, 2014). The Michigan Supreme Court likewise denied leave to appeal for failure to meet the burden of establishing entitlement to relief under Rule 6.508(D). See People v. Tinsley, 866 N.W.2d 429 (Mich. 2015).

On September 22, 2015, Petitioner returned to this Court and filed an amended petition. Amended Pet. for Writ of Habeas Corpus (Dkt. 18). The Court then re-opened this case and directed Respondent to file a supplemental answer. Opinion and Order (Dkt. 19). Respondent subsequently filed an answer to the amended petition in which he incorporated by reference his prior answer. He also argued that Petitioner's first claim was procedurally defaulted, his new claims were time-barred, and the state-court decisions were not contrary to federal law, unreasonable applications of federal law, or unreasonable determinations of the facts. Answer in Opposition to Amended Pet. for Writ of Habeas Corpus (Dkt. 20). Petitioner filed a reply, stating that his claims were not procedurally defaulted or barred by the statute of limitations, that his claims had substantial merit, and that he is actually innocent. He urges the Court to review his claims on their merits. Reply to Pet. for Writ of Habeas Corpus (Dkt. 25).

## II. STANDARD OF REVIEW

Title 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, imposes the following standard of review for habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. Williams v. Taylor, 529 U.S. 362, 405-406 (2000). An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." Id. at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411.

The Supreme Court has explained that a "federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). Thus, the AEDPA "imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 773 (2010). A "state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. at 102. Furthermore, pursuant to section 2254(d), "a habeas court must determine what arguments or theories supported or . . . could have supported,

the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court.  Id.  Habeas relief is not appropriate unless each ground that supported the state-court's decision is examined and found to be unreasonable under the AEDPA.  See Wetzel v. Lambert, 520 U.S. 520, 525 (2012).

"If this standard is difficult to meet, that is because it was meant to be."  Harrington, 562 U.S. at 102.  Although 28 U.S.C. § 2254(d), as amended by the AEDPA, does not completely bar federal courts from re-litigating claims that have previously been rejected in the state courts, it preserves the authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" the Supreme Court's precedents.  Id.  Indeed, section 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal."  Id.  Thus, a "readiness to attribute error [to a state court] is inconsistent with the presumption that state courts know and follow the law."  Woodford v. Viscotti, 537 U.S. 19, 24 (2002).  Therefore, in order to obtain habeas relief in federal courts, a state prisoner is required to show that the state-court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Harrington, 562 U.S. at 103.

A state-court's factual determinations are presumed correct on federal habeas review.  See 28 U.S.C. § 2254(e)(1).  A habeas petitioner may rebut this presumption of correctness only with clear and convincing evidence.  Id.; Warren v. Smith, 161 F.3d 358, 360-61 (6th Cir. 1998).  Moreover, habeas review is "limited to the record that was before the state court."  Cullen v. Pinholster, 563 U.S. 170, 181 (2011).

### III. ANALYSIS

### A.  Claim One: Suppression of Evidence

The first claim alleges that the prosecution violated Petitioner's right to due process by suppressing material evidence. The evidence in question was a recording of Darlene Russell's phone call to a 911 operator after the shooting. Although the state trial court ordered the prosecution to produce the recording of Russell's call, Diaz testified at trial that he attempted unsuccessfully to acquire the recording and that the recording was no longer available. Petitioner claims to have new evidence that the recording was stored on a computer hard drive and that it can be retrieved.

### 1. The State-Court Rulings and Procedural Default

Petitioner raised a similar claim on direct appeal, arguing that the trial court should have dismissed the charges because the prosecution destroyed the 911 recording. The Michigan Court of Appeals rejected the claim because there was no evidence that the police or prosecution destroyed or failed to preserve the 911 recording in bad faith. The Court of Appeals also stated that there was no indication the recording would have been exculpatory.

Following his direct appeal, Petitioner investigated the matter and discovered new evidence that 911 recordings are stored on a computer hard drive and can be retrieved. Petitioner then filed a motion for relief from judgment, which the state trial court denied in a reasoned opinion, citing Michigan Court Rule 6.508(D).[1] The state appellate courts denied Petitioner's subsequent

---

[1] The relevant portions of this Rule read as follows:

> **(D) Entitlement to Relief.** The defendant has the burden of establishing entitlement to the relief requested. The court may not grant relief to the defendant if the motion
>
> . . . .
>
> (2) alleges grounds for relief which were decided against the defendant in a prior appeal or proceeding under this subchapter, unless the defendant establishes that a retroactive change in the law has undermined the prior decision;

applications for leave to appeal in brief orders which stated that Petitioner had failed to establish entitlement to relief under Rule 6.508(D). Respondent argues that Petitioner's claim is procedurally defaulted to the extent Petitioner is raising a novel claim that was not raised on direct appeal. Answer in Opposition to Amended Pet., pp. 20-24 (Dkt. 20); <u>see</u> Rule 6.508(D)(3).

In the habeas context, a procedural default is "a critical failure to comply with state procedural law." <u>Trest v. Cain</u>, 522 U.S. 87, 89 (1997). Pursuant to the doctrine of procedural default, a federal court may decline to review the merits of a state prisoner's claim if a state court decided not to hear the claim because the prisoner failed to abide by a state procedural rule. <u>Martinez v. Ryan</u>, 566 U.S. 1, 9 (2012). But "a procedural default does not bar consideration of a federal claim on . . . habeas review unless the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar." <u>Harris v. Reed</u>, 489 U.S. 255, 263 (1989) (internal quotation marks omitted). Courts engage in the following four-step inquiry when determining whether a habeas petitioner's claim has been procedurally defaulted:

> First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that petitioner failed to comply with the rule. . . . Second, the court must decide whether the state courts actually enforced the state procedural sanction. . . . Third, the court must decide whether the state procedural ground is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim. . . . Once the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate . . . that there

---

> (3) alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal from the conviction and sentence or in a prior motion under this subchapter, unless the defendant demonstrates
>
>> (a) good cause for failure to raise such grounds on appeal or in the prior motion, and
>>
>> (b) actual prejudice from the alleged irregularities that support the claim for relief.

Mich. Ct. R. 6.508(D)(2) and (3).

was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

Kelly v. Lazaroff, 846 F.3d 819, 828 (6th Cir. 2017) (quoting Stone v. Moore, 644 F.3d 342, 346 (6th Cir. 2011) (quoting Maupin v. Smith, 785 F.2d 135, 138 (6th Cir. 1986)).

The state procedural rule in question here is Michigan Court Rule 6.508(D)(3), which generally prohibits state courts from granting relief from judgment if the defendant could have raised his or her claim on appeal from the conviction. To determine whether a state court enforced this rule, courts look to the last reasoned state court opinion rejecting the petitioner's claim. Guilmette v. Howes, 624 F.3d 286, 291 (6th Cir. 2010) (en banc).

The last state court to issue a reasoned opinion on Petitioner's claim, as currently styled, was the state trial court on collateral review of Petitioner's convictions. The trial court cited Rule 6.508(D)(3) in its decision denying Petitioner's motion for relief from judgment and stated that Petitioner had failed to show both "good cause" under Rule 6.508(D)(3)(a) for failing to raise his claim on direct appeal and "actual prejudice."

Rule 6.508(D)(3) is an adequate and independent ground on which state courts may rely to foreclose review of federal claims. Howard v. Bouchard, 405 F.3d 459, 477 (6th Cir. 2005). However, the trial court also stated that Petitioner had previously raised his Brady claim on direct appeal and that he was precluded from re-litigating the claim by Rule 6.508(D)(2). 3/21/14 Opinion (Dkt. 21-4). The state court inexplicably concluded both that Petitioner was precluded from raising his claim because the claim had already been litigated on direct appeal and that the claim was barred because Petitioner failed to raise his claim on direct appeal. "At most, the order is ambiguous, and . . . ambiguous orders do not provide adequate and independent state grounds." Peoples v. Lafler, 734 F.3d 503, 511 (6th Cir. 2013) (citing Guilmette, 624 F.3d at 289–92).

The Court concludes that Petitioner's claim is not procedurally defaulted because the last state trial court to render a reasoned decision on Petitioner's claim did not clearly and expressly

state that its decision rested on the procedural bar found in Rule 6.508(D)(3).  Further, the rejection of Petitioner's claim under 6.508(D)(2) is not a bar to federal habeas review.  Id. at 512.  The Court will proceed to address the merits of Petitioner's claim.

### 2.  The Merits

Petitioner claims that the prosecution violated his right to due process by suppressing information about the recording that Ms. Russell made to a 911 operator after the shooting.  The Supreme Court has held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Brady v. Maryland, 373 U.S. 83, 87 (1963).  There are three components to a true Brady claim:  "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  Strickler v. Greene, 527 U.S. 263, 281-82 (1999).  "[E]vidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  Id. at 280 (quoting United States v. Bagley, 473 U.S. 667, 676 (1985)).

The fact that Russell made a call to the 911 operator after the shooting was not suppressed. Petitioner's first attorney knew about the call and attempted to acquire a recording of the call before Petitioner's first trial, and because the prosecution never acquired the recording, it cannot be said that the prosecution suppressed the recording.

Petitioner, nevertheless, contends that the prosecution (i) perpetuated an erroneous belief that the 911 call was stored on an erasable magnetic tape instead of a computer, (ii) falsely claimed that the recording was irretrievably purged after ninety days, (iii) concealed how government agents routinely retrieve 911 records from its computerized storage system after ninety days, and

(iv) concealed the fact that the digital forensic experts can retrieve the requested evidence today. The record does not support Petitioner's contention that the prosecution suppressed information about 911 calls being stored on a computer. Diaz testified at Petitioner's trial that he thought 911 calls were kept on a computer. 5/19/08 Trial Tr. at 85 (Dkt. 11-43).

The record also does not support the contention that the prosecution knew how to retrieve deleted 911 recordings and concealed that information from the defense. In addition, although Petitioner asserts that the prosecution falsely claimed the 911 recording was unavailable, he was able to determine through an independent investigation conducted after his second trial that 911 recordings can be retrieved from a computer's hard drive even if a recording is purged or deleted. There is no Brady violation when "a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information." Coe v. Bell, 161 F.3d 320, 344 (6th Cir. 1998).

More importantly, Petitioner has not shown that the missing 911 recording was exculpatory. He contends that the recording would have supported his alibi defense and could have been used to impeach Russell and undermine her identification of him as the shooter. According to Petitioner, the recording would have shown that Russell failed to name the shooter during the call. Russell, however, testified at a pretrial hearing and at trial that the 911 operator did not ask her about the shooter. 4/18/07 Mot. Hr'g at 10 (Dkt. 11-12); 5/13/08 Trial Tr. at 41 (Dkt. 11-40). Petitioner merely speculates that the operator asked Russell about the shooter's identity. His Brady claim fails because he has not shown that the missing 911 recording was material evidence.

Petitioner also has failed to show that he was prejudiced by the prosecution's failure to produce the 911 recording. Russell admitted at trial that she did not tell the 911 operator who shot her. 5/13/08 Trial Tr. at 41 (Dkt. 11-40). She also admitted that she did not identify the shooter in her other calls to people after the shooting or to the police at the crime scene, the emergency

medical technicians, or the doctor at the hospital.  Id. at 103-05.  She did, however, identify Petitioner in a photo array on the day after the shooting, id. at 53, and other witnesses testified that she informed them the shooter was the same man who had assaulted Mosley in his home, id. at 205 (emergency medical technician Rae C. Johnson's testimony); 5/14/08 Trial Tr. at 59-60 (Dkt. 11-41) (Officer Michael Malone's testimony).

The jury had sufficient information with which to evaluate Ms. Russell's credibility, and there was independent evidence supporting her identification of Petitioner as the shooter.  Thus, there is not a reasonable probability that, had the prosecution acquired and disclosed the 911 recording to the defense, the result of the trial would have been different.  The state courts' rejection of Petitioner's claim was objectively reasonable.

### B. Claim Two:  Ineffective Assistance of Counsel

Petitioner alleges next that his trial attorney violated his right to effective assistance of counsel by failing to investigate and produce crucial defense witnesses.[2]  The four witnesses in question are the 911 operator, Chakan Tinsley, Jerry Hicks, and attorney Jon Posner.

---

[2]  Respondent claims that Petitioner failed to raise a portion of this claim and other claims in his initial petition and that the claims are now barred by the one-year habeas statute of limitations, 28 U.S.C. § 2244(d).  Specifically, Respondent contends that the amended petition raises new claims that (i) trial counsel failed to investigate the 911 operator, (ii) trial counsel failed to investigate whether a warrant was issued for Chivas Dooley, and (iii) Petitioner was denied his right to counsel.  Answer in Opposition to Amended Pet. at 37-50 (Dkt. 20).

Although Petitioner's claim that he was denied his right to counsel by the prosecutor's misconduct is new, see Brief in Support of Amended Pet. at 33-34, (Dkt. 18), Petitioner raised the other allegedly new claims about defense counsel in his initial petition and brief.  He argued that attorneys have a duty to investigate the law and the facts and that failure to investigate promising witnesses and key evidence is deficient performance.  Brief in Support of Pet. for Writ of Habeas Corpus at 20 (Dkt. 1).  And he asserted in his heading for claim five of the initial brief that trial counsel was ineffective for failing to question whether a warrant was issued for Dooley.  Id. at II (Dkt. 1) and 59 (Dkt. 1-1).

Even if some of Petitioner's claims are new, the habeas statute of limitations is not jurisdictional.  Allen v. Yukins, 366 F.3d 396, 401 (6th Cir. 2004).  The Court will proceed to adjudicate Petitioner's claims, because they do not warrant habeas relief.

### 1. The State Appellate Court's Decision and Procedural Default

Petitioner raised his claims about Chakan Tinsley, Jerry Hicks, and Jon Posner on direct appeal. The Michigan Court of Appeals adjudicated the claims on their merits and concluded that defense counsel was not ineffective for failing to call Tinsley, Hicks, or Posner.

As for the 911 operator, Petitioner argued on appeal that his trial attorney was ineffective for failing to call Shante Jeffries, a veteran 911 operator who testified at Petitioner's first trial about procedures that 911 operators are expected to follow. The Michigan Court of Appeals rejected this claim on the ground that Jeffries was not the operator who took Russell's call and she had no personal knowledge of the shooting or Russell's call. The Court of Appeals stated that there was no basis for concluding that the 911 call had any effect on the jury's verdict and, therefore, Petitioner was not prejudiced by defense counsel's failure to call the veteran 911 operator.

Petitioner argues in his amended petition that trial counsel was ineffective for failing to investigate and call the 911 operator who actually took Russell's call after the shooting. Respondent argues that this claim is procedurally defaulted because Petitioner did not raise the same claim on direct appeal while he had an available state remedy to exhaust.

Procedural default ordinarily is not a jurisdictional matter, Johnson v. Lee, 136 S. Ct. 1802, 1806 (2016) (citing Trest, 522 U.S. at 89), and "'[j]udicial economy might counsel' bypassing a procedural-default question if the merits 'were easily resolvable against the habeas petitioner.'" Id. (quoting Lambrix v. Singletary, 520 U.S. 518, 525 (1997)). Petitioner's claim about defense counsel's failure to investigate and call the 911 operator lacks merit, and the Court finds it more efficient to address the substantive merits of Petitioner's claim than to determine whether the claim is procedurally defaulted. The Court, therefore, excuses the alleged procedural default regarding Petitioner's claim about the 911 operator.

### 2. Clearly Established Supreme Court Precedent

The "clearly established Federal law" for Petitioner's claims of ineffective assistance of counsel is Strickland v. Washington, 466 U.S. 668 (1984). Cullen, 563 U.S. at 189. Under Strickland, a defendant must show "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." Strickland, 466 U.S. at 687. "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." Id.

The deficient-performance prong "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. "[T]he defendant must show that counsel's representation fell below an objective standard of reasonableness." Id. at 688.

The "prejudice" prong "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687. A defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

"The standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." Harrington, 562 U.S. at 105 (internal citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id.

On the issue of investigations, the Supreme Court has said that

[c]ounsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691, 104 S.Ct. 2052. "[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." Rompilla v. Beard, 545 U.S. 374, 383, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005). The Supreme Court has held that counsel is not ineffective for failing to investigate if "further investigation would have been fruitless," Wiggins v. Smith, 539 U.S. 510, 525,

22

123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), because the additional evidence "would be of little help," Strickland, 466 U.S. at 699, 104 S.Ct. 2052, "can reasonably be expected to be only cumulative," Bobby v. Van Hook, 558 U.S. 4, 11, 130 S.Ct. 13, 175 L.Ed.2d 255 (2009), or carries "serious risks" of "expos[ing defendant's story] as an invention," Harrington, 562 U.S. at 108, 131 S.Ct. 770.

Fitchett v. Perry, 644 F. App'x 485, 491 (6th Cir. 2016).

Under Strickland, the Court "must presume that decisions of what evidence to present and whether to call or question witnesses are matters of trial strategy." Cathron v. Jones, 77 Fed. App'x 835, 841 (6th Cir. 2003) (citing Hutchison v. Bell, 303 F.3d 720, 749 (6th Cir. 2002)). "'A defense counsel has no obligation to call or even interview a witness whose testimony would not have exculpated the defendant.'" Millender v. Adams, 376 F.3d. 520, 527 (6th Cir. 2004) (quoting Millender v. Adams, 187 F. Supp.2d 852, 877 (E.D. Mich. 2002) (citing Marra v. Larkins, 111 F. Supp. 2d 575, 585 n. 13 (E.D. Pa. 2000)).

### 3. Application

#### a. The 911 Operator

Petitioner alleges that defense counsel should have produced the 911 operator who spoke with Ms. Russell after the shooting. According to Petitioner, the operator would have established that Russell failed to identify the shooter when the operator asked about the suspect. Russell, however, claimed that the operator did not ask her about the shooter, and Petitioner merely speculates that the operator did ask for information about the shooter. A defense attorney's failure to pursue a defendant's purely speculative claim does not fall below an objective standard of reasonableness. United States v. Burwell, 83 F. Supp. 3d 6, 12 (D. D.C. 2015). Furthermore, as previously explained, Russell identified the shooter to other people shortly after the shooting, and she admitted at trial that she did not identify the shooter when speaking to the 911 operator.

The Court concludes that the 911 operator would not have exculpated Petitioner. Therefore, defense counsel's failure to investigate and call the operator did not amount to deficient

performance, and the allegedly deficient performance did not prejudice Petitioner.  Millender, 376 F.3d. at 527.

### b. Chakan Tinsley

Chakan Tinsley is Petitioner's sister and Mosley's former girlfriend.  She testified at Petitioner's first trial that she lived with Mosley for about a year and a half and moved out of his house a few months before the shooting.  She claimed that the reason she stopped living with Mosley was that she wanted to move on with her life.  7/26/07 Trial Tr. at 143-47 (Dkt. 11-26).

Petitioner contends that his trial attorney should have produced Tinsley at his second trial to refute Chelsea Mosley's trial testimony that her father, Charles Mosley, had a tumultuous relationship with Tinsley.  According to Petitioner, Chakan's testimony would have undermined the prosecution's theory that the contentious relationship between Tinsley and Charles Mosley, as described by Chelsea Mosley, was Petitioner's motivation for shooting Mosley.

Tinsley, however, testified about an incident when she tried to prevent Mosley from drinking and driving.  She described how she hid Mosley's car keys behind her back because Mosley was drunk and was getting ready to go somewhere in his car.  She claimed that Mosley bent her arm back "real hard" at the time and that she reacted by screaming, yelling, and asking Mosley to stop what he was doing.  She called the police to report the incident.  Id. at 151-52.

Tinsley also testified that, after she moved out of Mosley's home, Mosley called her frequently.  While some of the messages were positive, others were negative, and she did not like the constant calls or the threatening nature of some of the calls.  Id. at 158, 168-169.  The Michigan Court of Appeals observed on direct review that this testimony would have provided the prosecution with an additional motive for Petitioner to act out against Mosley.  The Court of Appeals also pointed out that Tinsley's testimony would have done little to advance Petitioner's alibi defense and misidentification theory.  This Court agrees and concludes that defense counsel was not ineffective for failing to call Tinsley as a witness at Petitioner's second trial.

### c. Jerry Hicks

Jerry Hicks testified at Petitioner's first trial that he witnessed the shooting and that Petitioner was not the shooter. Id. at 86. Petitioner asserts that his attorney should have produced Hicks at the second trial to support Petitioner's alibi defense and to help the jury decide the key issue at trial, namely, the shooter's identity. But Hicks' testimony was problematic because, even though he provided a general description of the shooter and the shooter's actions at trial, he admitted that he did not bother to inform the police what he saw. Id. at 95-96. He also admitted that he was testifying because Petitioner's brother was his friend, and he gave the impression that his testimony was based on a fabricated witness statement. Id. at 97-106.

To his credit, defense counsel produced Mario Jackson at the second trial. Jackson testified that he was present during the shooting and that Petitioner was not the shooter. 5/20/08 Trial Tr. at 15, 17 (Dkt. 11-44). The Court agrees with the Michigan Court of Appeals that defense counsel was not ineffective for failing to investigate and call Jerry Hicks as a witness and for producing Mario Jackson instead.

### d. Jon Posner

Attorney Jon Posner testified at the first trial that Petitioner had a thick, full beard on the day after the shooting. 8/2/07 Trial Tr. at 89-90 (Dkt. 11-28). Petitioner argues that Posner could have impeached eyewitnesses who did not say anything about the shooter having a beard and Eric Pringle who testified at the second trial that the gunman had a thin or closely shaved goatee, not a full or bushy beard. 5/14/08 Trial Tr. at 20-21, 37, 45 (Dkt. 11-41). Other witnesses, however, testified that Petitioner had a full beard at the time of the shooting. 5/20/08 Trial Tr. at 41-42 (Dkt. 11-44) (Victor Burnett); id. at 107-08, and 5/21/08 Trial Tr. at 9-12 (Dkt. 11-45) (Chivas Dooley). Furthermore, Posner, described Petitioner as being full and sturdy, not skinny. 8/2/07 Trial Tr. at 94 (Dkt. 11/28). This testimony confirmed the eyewitnesses' testimony that the shooter was a stocky man.

Posner also testified that he had met Petitioner in an attorney-client capacity on October 21, 2006. Id. at 94. As the Michigan Court of Appeals pointed out, defense counsel may have decided not to call Posner to avoid drawing attention to the fact that Petitioner contacted Posner in his professional capacity as an attorney shortly after the shooting. For all these reasons, defense counsel was not ineffective for failing to investigate and call Jon Posner as a witness.

### 4. Conclusion

For the reasons given above, defense counsel's performance was not deficient, and the alleged deficiencies did not prejudice Petitioner. Even if the Court had concluded otherwise, the state appellate court's adjudication of Petitioner's claim about trial counsel was objectively reasonable. Therefore, under Strickland's doubly deferential standard, Petitioner has no right to relief on the basis of his claim about trial counsel.

### C. Claim Three: Prosecutorial Misconduct

Petitioner alleges next that the trial prosecutor's misconduct deprived him of a fair trial and due process of law. Specifically, Petitioner contends that the prosecutor: (i) presented false evidence about a pending warrant for Chivas Dooley and implied that Dooley was an accomplice to the murder and (ii) made disparaging comments about defense counsel by implying that defense counsel was intentionally trying to mislead the jury.

Petitioner raised his claim about the prosecutor on direct appeal. The Michigan Court of Appeals reviewed the claim for plain error because Petitioner did not object at trial. The Court of Appeals went on to conclude that Petitioner had not established plain error. Respondent argues on the basis of the state court's plain error review that Petitioner procedurally defaulted his prosecutorial-misconduct claim. In the interest of judicial economy, the Court excuses the alleged procedural default and proceeds to address Petitioner's claim on its merits.

### 1. Legal Framework

"Claims of prosecutorial misconduct are reviewed deferentially" in a habeas corpus case, Millender, 376 F.3d at 528, and the Supreme Court's cases "demonstrate that the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." Smith v. Phillips, 455 U.S. 209, 219 (1982). The relevant question is whether the prosecutor's conduct infected the trial with such unfairness as to make the resulting conviction a denial of due process. Darden v. Wainwright, 477 U.S. 168, 181 (1986).

> Because that standard is "a very general one," courts have considerable leeway in resolving such claims on a case-by-case basis. Parker v. Matthews, 567 U.S. 37, 48, 132 S.Ct. 2148, 183 L.Ed.2d 32 (2012) (per curiam). That leeway increases in assessing a state court's ruling under AEDPA. [Courts] "cannot set aside a state court's conclusion on a federal prosecutorial-misconduct claim unless a petitioner cites . . . other Supreme Court precedent that shows the state court's determination in a particular factual context was unreasonable." Trimble [v. Bobby, 804 F.3d 767, 783 (6th Cir. 2015)].

Stewart v. Trierweiler, 867 F.3d 633, 638-39 (6th Cir. 2017).

## 2. Testimony and Comments about an Arrest Warrant

Ms. Russell testified that a few weeks before the shooting, two men assaulted Mosley in his home and that Mosley told her Petitioner was one of the men involved in the incident. At Petitioner's trial, two police officers testified that a warrant for Chivas Dooley's arrest had been prepared in connection with the felonious assault on Mosley in his home on October 1, 2006. 5/14/08 Trial Tr. at 136-39 (Dkt. 11-41); 5/19/08 Trial Tr. at 139-40 (Dkt. 11-43).

Petitioner states that, after his trial, one of his former attorneys learned that no arrest warrant was issued for Chivas Dooley. As a result of this new information, Petitioner argues that the prosecutor presented false testimony that an arrest warrant had been issued for Dooley in connection with the incident at Mosley's home on October 1, 2006

> As long ago as Mooney v. Holohan, 294 U.S. 103, 112, 55 S.Ct. 340, 342, 79 L.Ed. 791 (1935), [the Supreme] Court made clear that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.' This was reaffirmed in Pyle v. Kansas, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942). In Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), [the Supreme Court] said, '(t)he same result obtains

when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.' Id., at 269, 79 S.Ct., at 1177.

Giglio v. United States, 405 U.S. 150, 153 (1972). But

to prove that the prosecutor's failure to correct false testimony violated due process rights, a petitioner must demonstrate that: (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false.

Rosencrantz v. Lafler, 568 F.3d 577, 583–84 (6th Cir. 2009).

Diaz testified at Petitioner's trial that he thought another officer had prepared a warrant naming Dooley as a suspect in the assault on Mosley at Mosley's home. He explained, however, that he did not execute the warrant, arrest Dooley, or proceed against Dooley because the prosecutor had advised him not to do so, as Dooley was a defense witness for Petitioner. 5/19/08 Trial Tr. at 102-04, 139 (Dkt. 11-43). This may explain why Petitioner has found no record of a warrant for Dooley's arrest.

Even if the officers were mistaken about the warrant, there is no evidence that the prosecutor in the murder case knew that the officers' testimony about a warrant being issued in the felonious assault case was false. Thus, Petitioner's claim that the prosecutor failed to correct false testimony lacks merit, and the state appellate court's rejection of the claim was objectively reasonable.

### 3. Suggesting that Dooley was an Accomplice

The prosecutor stated in her closing argument that it was "the People's position that Mr. Dooley was the getaway driver" and that Dooley "was present at the getaway scene." 5/22/08 Trial Tr. at 20, 26 (Dkt. 11-40). Petitioner alleges that the prosecutor misled the jurors by arguing that Dooley was an accessory to the shooting for which Petitioner was on trial.

Although "[i]t is improper for a prosecutor, during closing arguments, to bring to the attention of the jury any 'purported facts that are not in evidence and are prejudicial,'" they "'must be given leeway to argue reasonable inferences from the evidence.'" Byrd v. Collins, 209 F.3d

486, 535 (6th Cir. 2000) (internal citations omitted). In this case, Russell informed Diaz that Dooley was present with Petitioner at Mosley's house on October 1, 2006. Dooley himself testified that he and Petitioner were together most of the day on October 20, 2006, and that he was the driver and Petitioner was the passenger. He also testified that he and Petitioner drove by the gas station after the shooting, 5/21/08 Trial Tr. at 49, 77-80 (Dkt. 11-45), and he admitted that he might be a wanted man, 5/20/08 Trial Tr. at 90 (Dkt. 11-44). In light of the evidence, the prosecutor's comment that Dooley likely was the getaway driver after the shooting on October 20, 2006, was a reasonable inference from the evidence. As such, the comment was proper and the state appellate court's rejection of the claim was reasonable.

### 4. Denigrating Defense Counsel

Petitioner argues next that the prosecutor denigrated defense counsel in her closing argument by implying that defense counsel was trying to mislead the jury. The Supreme Court has stated that attorneys may not "make unfounded and inflammatory attacks on the opposing advocate." United States v. Young, 470 U.S. 1, 9 (1985). But a prosecutor's response to evidence presented at trial or to defense counsel's closing argument is well within the prosecutor's wide latitude to respond to the defense's case. Wogenstahl v. Mitchell, 668 F.3d 307, 330 (6th Cir. 2012).

During her closing argument, the prosecutor summarized some of the prosecution witnesses' testimony and then encouraged the jurors to look at defense counsel's case and ask themselves whether they could put their faith and belief in someone like Chivas Dooley. She went on to suggest that Dooley was the getaway driver after the shooting, that his time frame for the events was not credible, and that Dooley did nothing to help Petitioner's case. The prosecutor maintained that Mario Jackson was not present during the shooting and that he had a motive for testifying as he did. As for Victor Burnett, the prosecutor said that he and Dooley recapped the

events of the day so that they could get their story straight.  5/22/08 Trial Tr. 19-20, 22-26 (Dkt. 11-46).

Defense counsel subsequently argued that the case was not about Dooley and that, instead, the case was about identification.  Defense counsel then attempted to discredit the prosecution witnesses, and he argued that the timeline presented by the defense witnesses, while not perfect, was not defeated by the prosecution.  He maintained that the prosecution did not carry its burden of proof.  Id., pp. 29-51.

On rebuttal, the prosecutor stated that defense counsel had presented a common theme that everybody except the defendant was on trial.  The prosecutor also stated that defense counsel wanted the jurors to spend time looking at what evidence was missing because he did not want them to see what evidence was present.  She stated that it was not a case of identification and that it was a case of intent.  She then attempted to refute many of the things that defense counsel had said about the evidence in his argument.  Id. at 51-58.  The prosecutor's arguments were proper because they were based on the evidence and they were a response to defense counsel's closing argument.

The trial court, moreover, instructed the jury at the beginning and at the close of the case that the attorneys' closing arguments were not evidence and that the jurors should base their verdict only on the evidence.  5/12/08 Trial Tr. at 111-12 (Dkt. 11-39); 5/22/08 Trial Tr. at 5, 59, 62 (Dkt. 11-46).  Because jurors are presumed to have followed the trial court's instructions to them, Richardson v. Marsh, 481 U.S. 200, 211 (1987); Stanford v. Parker, 266 F.3d 442, 459 (6th Cir. 2001), the prosecutor's closing arguments in all likelihood did not have a "substantial and injurious effect or influence" on the jury's verdict and were harmless.  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993).

None of the prosecutor's conduct or remarks infected Petitioner's trial with such unfairness as to make the resulting conviction a denial of due process. Therefore, Petitioner is not entitled to relief on the basis of his prosecutorial-misconduct claim.

**D. Claim Four: Failure to Reveal a Witness's Reward for Testifying**

The fourth habeas claim alleges that the prosecution failed to disclose that it rewarded Eric Pringle for his trial testimony, which Pringle altered at the second trial by including a description of the gunman's facial hair.[3] The basis for this claim is Pringle's post-trial affidavit that, before Petitioner's first trial, and continuing through his second trial, a detective and the prosecutor assigned to Petitioner's case promised to resolve Pringle's unpaid parking tickets and to provide him with a job at the Detroit Police Department in return for his description of the shooter at Petitioner's trial. Pringle states in his affidavit that he believed the prosecution would take care of his tickets and give him a job with the police department if his testimony matched what the prosecution wanted him to say. Pringle states that, although he testified about the shooter's facial features at both trials, he never saw the shooter's face and that he believes his inaccurate description of the shooter has led to the conviction of an innocent man. Amended Pet., Ex. P (Dkt. 18).

The Michigan Court of Appeals addressed Petitioner's claim on direct appeal and concluded that any impeachment of Pringle's testimony would not have changed the outcome of Petitioner's case. The Supreme Court has said that,

> under <u>Brady</u>, the State violates a defendant's right to due process if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment. . . . "[E]vidence is 'material' within the meaning of <u>Brady</u> when there

---

[3] At Petitioner's first trial, Pringle explained that he had described the shooter to the police as an African American male, five feet, seven inches to five feet, nine inches tall, a hundred ninety-five to two hundred thirty-five pounds, sturdy, with a short haircut, and twenty-three to twenty-seven years old. 7/19/07 Tr. at 168, 177 (Dkt. 11-22). When questioned by defense counsel, he agreed that the person he saw did not have a full beard. <u>Id</u>. at 177. At the second trial, he said that the shooter had a thin goatee. 5/14/08 Tr. at 20-21, 37 (Dkt. 11-41).

is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." <u>Cone v. Bell</u>, 556 U.S. 449, 469–470, 129 S.Ct. 1769, 173 L.Ed.2d 701 (2009). A reasonable probability does not mean that the defendant "would more likely than not have received a different verdict with the evidence," only that the likelihood of a different result is great enough to "undermine[ ] confidence in the outcome of the trial." <u>Kyles v. Whitley</u>, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (internal quotation marks omitted).

     . . . .

[E]vidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict. See <u>United States v. Agurs</u>, 427 U.S. 97, 112–113, and n. 21, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

<u>Smith v. Cain</u>, 565 U.S. 73, 75–76 (2012).

Here, even assuming that Pringle's affidavit about being promised benefits for his testimony is true, he did not identify Petitioner at trial, and defense counsel cross-examined him about the change in his description of the shooter's face. 5/14/08 Trial Tr. at 37-38 (Dkt. 11-41). Ms. Russell, moreover, was certain that Petitioner was the shooter. 5/13/08 Trial Tr. at 105-06, 114 (Dkt. 11-40). Given Ms. Russell's testimony, and Pringle's failure to identify Petitioner as the shooter, there is not a reasonable probability that, had the alleged promises to Pringle been disclosed to the defense, the result of the trial would have been different. Thus, the alleged impeachment evidence was not material evidence, and Petitioner's due process claim fails.

### E. Claim Five: Failure to Object to the Prosecutor's Misconduct

In his fifth and final claim, Petitioner alleges that defense counsel provided ineffective assistance when he failed to investigate and ascertain that no warrant was issued for Chivas Dooley. Petitioner further alleges that defense counsel was ineffective for failing to object to the prosecutor's misrepresentation of evidence about the warrant for Dooley's arrest and her disparaging remarks about defense counsel. Petitioner argues that the outcome of the trial likely would have been different were it not for counsel's deficient performance.

The Supreme Court has stated that "[c]ounsel is unconstitutionally ineffective if his performance is both deficient, meaning his errors are 'so serious' that he no longer functions as 'counsel,' and prejudicial, meaning his errors deprive the defendant of a fair trial." Maryland v. Kulbicki, 136 S. Ct. 2, 3 (2015) (per curiam) (citing Strickland, 466 U.S. at 687) (emphasis omitted).  As noted above, the prosecutor's closing arguments about the defense theory were not improper, and it does not appear that the officers testified falsely about obtaining a warrant for Dooley's arrest or that the prosecutor knew the officers' testimony was false.  Consequently, trial counsel's failure to object to the prosecutor's conduct or to question whether a warrant had been issued for Dooley did not amount to ineffective assistance.

### F. Certificates of Appealability and Proceeding In Forma Pauperis on Appeal

Petitioner may not appeal the Court's denial of his habeas petition unless a district or circuit judge issues a certificate of appealability.  28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b)(1).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  Miller-El, 537 U.S. at 327 (citing Slack v. McDaniel, 529 U.S. 473, 484 (2000)).

Reasonable jurists could not find the Court's assessment of Petitioner's claims debatable or wrong.  Accordingly, the Court will deny a certificate of appealability.  The Court, nevertheless, will allow Petitioner to proceed in forma pauperis on appeal because the Court granted him permission to proceed in forma pauperis in this Court (Dkt. 5), and an appeal could be taken in good faith.  28 U.S.C. § 1915(a)(3); Fed. R. App. P. 24(a)(3)(A).

### IV. CONCLUSION

For the reasons given above, the state court decisions rejecting Petitioner's claims were not contrary to Supreme Court precedent or unreasonable applications of Supreme Court precedent. The state court also did not unreasonably apply the facts to Petitioner's case. The Court, therefore, denies the amended petition for writ of habeas corpus (Dkt. 18). The Court also denies a certificate of appealability, but grants leave to proceed in forma pauperis on appeal.

SO ORDERED.

Dated: June 19, 2018                     s/Mark A. Goldsmith
   Detroit, Michigan                    MARK A. GOLDSMITH
                                    United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 19, 2018.

                                      s/Karri Sandusky
                                      Case Manager